UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14 CR 00113 JAR/NCC |
| | ) | |
| MALIK MUHAMMED, | ) | |
| | ) | |
| Defendant. | ) | |

## TRIAL BRIEF OF UNITED STATES

COMES NOW the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Andrew Lay, Assistant United States Attorneys for said District, and submits the following Trial Brief in connection with the trial of the above-styled matter.

## I.    Procedural History

On April 16, 2014, the Grand Jury returned a five-count indictment against Malik Muhammed ("Muhammed").   Counts One through Five charge Muhammed with making false statements to health care programs in violation of 18 U.S.C. §§ 1035(a)(2) and 2.   Defendant waived the filing of pretrial motions.   The case is set for trial starting on September 29, 2014.

## II.    Overview of Anticipated Evidence

At all times relevant to the charges, Muhammed owned and operated the Your Accident and Injury Clinic ("YAIC"), a chiropractic office located in Florissant, Missouri.   As the owner and operator of this chiropractic clinic, Muhammed personally prepared claims for reimbursement of chiropractic services allegedly performed by YAIC to various automobile insurance companies.

Licensed health care providers, including but not limited to chiropractors, use Current Procedural Terminology ("CPT") codes to describe the service they provided when requesting

1

reimbursement from insurance companies.   By submitting claims using these CPT codes, providers represent to health care benefit programs that the services described by the codes were actually provided.   Whether or not services were actually provided to patients by licensed health care providers is material to health care benefit programs, as the programs do not pay for medical services that were never rendered or provided, and do not pay for treatments and office visits performed by unqualified and unlicensed personnel.

There are several CPT codes at issue in this case.   CPT codes 99211-215 discuss the billing of office visits by medical doctors and podiatrists, with these codes covering services for the various lengths of time that a physician typically spends face-to-face with the patient. Similarly, CPT code 97110 involves providing a patient with therapeutic procedures that effect change through the application of clinical skills and services in an attempt to improve function, with the code discussion explicitly stating that "physician or therapist required to have direct (one-on-one) patient contact" before billing. CPT codes 98940-943 discuss providing chiropractic manipulative treatment, a form of manual treatment to influence joint and neurophysiological function, to different regions of the spine and body.

"Face-to-face" CPT billing codes unambiguously require the health care provider to be present in the office and personally provide the service before these CPT codes can be billed to insurers.   *United States v. Singh*, 390 F.3d 168, 187 (2d Cir. 2004) (affirming health care fraud conviction of provider who submitted claims under CPT Code 99213 while he was actually out of the office because this CPT code unambiguously required face-to-face contact between the doctor and the patient before Medicare could properly be billed for office visits); *United States v. Palazzo*, 2008 WL 5381581 (E.D. La. 2008) (denying motion for acquittal where a doctor was billing Medicare for face to face office visits allegedly occurring in the morning when she did not arrive in the office until the afternoon).

The evidence in this case will show that defendant hired one chiropractor at a time to service all of YAIC's patients, and that one chiropractor would work at YAIC on regular days (e.g. every Tuesday and Thursday).   YAIC was closed on Sundays, and did not employ licensed physical therapists or other qualified health care professionals beyond a chiropractor to provide services to patients.

Muhammed's patient records, which were seized during the execution of a search warrant at YAIC, show that defendant repeatedly insurance companies for chiropractic services that were purportedly provided "face-to-face" with patients on days when the clinic's chiropractor actually did not work, including numerous bills for services purportedly provided on Sundays when the entire clinic was closed.

In terms of defendant's motive for making these false statements, the evidence will show that most of defendant's patients came to the clinic after automobile accidents, and received services from YAIC while pursuing civil tort suits against other drivers.   When settling "car crash" tort suits, insurers often pay the claimant's medical expenses times two or three.   The claimants then share any settlement proceeds from the tort suits with their lawyers and health care providers, including YAIC.   Defendant's business model can accurately be called "more visits, more money," as YAIC's charges typically were doubled or trebled as tort settlements. Defendant's motive in making false statements was to recover more money from insurance programs, as the total medical expenses drove up the cost of each settlement, and ultimately defendant's share of the settlements.

## III.   Elements of the Offense - False Statements Relating to Health Care Matters

Counts One through Five of the indictment charge the defendant with violating 18 U.S.C. § 1035(a)(2).   The four essential elements of this offense are:

3

A.      The defendant knowingly and willfully made statements regarding health care services to automobile insurance companies,

B.      defendant's statements were false and fraudulent in that licensed doctors or chiropractors did not personally provide the health care services,

C.      defendant's statements were in connection with the delivery of and payment for health care benefits, items, and services involving health care benefit programs, and;

D.      defendant's statements were material to the programs.

A "health care benefits program" is defined by 18 U.S.C. § 24(b) as a "public or private plan or contract," affecting commerce, under which medical benefits, items, and services are provided to individuals.   An automobile insurer that provides reimbursement to health care professionals for medical and chiropractic services that were provided to car crash victims is a "health care benefits program."   *United States v. Gelin*, 712 F.3d 612, 617-19 n.5 (1st Cir. 2013) (finding definition of health care program to be simple and broad after reviewing legislative history in federal criminal fraud case).

## IV.   **Non-Expert Handwriting Testimony**

The government expects to present handwriting evidence in this case**.**   Defendant's clinic kept medical records for each patient, typically using a one page "progress note" form to document each of the patient's visits to the clinic.   The YAIC form contained spaces to input information about the patient's medical condition and any treatments received on the day of the visit, plus boxes at the bottom of the form to check regarding which insurance CPT coding should be used for billing the visit.   At the bottom of the form, there is also a space for the "dr." to sign.

Chiropractors hired by defendant to work at YAIC will testify at trial that they filled out and signed portions of some of the forms in the medical records regarding the patients referenced in Counts 1-5 of the Indictment.   However, these medical providers will further testify that there

4

are a number of records in the files for the Indictment's five patients that the health care providers did not create or sign, even though these false records purportedly bear the doctors' signatures. These false records, not surprisingly, correspond to a number of billings for treatments allegedly occurring on Sundays when defendant's clinic was closed, or during days the chiropractors were not working their regularly scheduled two days a week at defendant's clinic.   At trial, the doctors who were formerly employed by defendant will identify which medical records contain their handwriting and signature, and which records do not.   After a foundation is laid, some of the providers may identify some signatures and handwriting in the records as the handiwork of defendant, especially in the CPT code billing section of the forms.

28 U.S.C. § 1731 provides "the admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person."   Accordingly, the Government can admit the various patient records into evidence, and let the jury compare the various "dr" signatures to determine if they are, indeed, similar or probative.  *Miller v. United States*, 410 F.2d 1290, 1296 (8th Cir. 1969) (no error to allow jury to examine assorted exhibits bearing defendant's handwriting for comparison purposes without the need for expert testimony); *Hardy v. United States*, 199 F.2d 704, 706-08 (8th Cir. 1952) (admitting document with defendant's handwriting for comparison purposes to other documents after authentication by lay witness who was familiar with defendant's handwriting through seeing the defendant sign "many papers").

To authenticate handwriting under Fed. R. Evid. 901(a), the Government must produce evidence sufficient to support a finding that the evidence is what the Government claims it to be. Fed. R. Evid. 901(b)(2) discusses several types of evidence, and provides that a non-expert's opinion on handwriting, if based on a familiarity with the handwriting which was not acquired for the instant litigation, is admissible as evidence.   When authenticating handwriting evidence, a

5

non-expert can demonstrate his or her familiarity by various experiences, including seeing the signatures on various documents that are indisputably genuine.   *United States v. Ali*, 616 F.3d 745, 754 (8th Cir. 2010) (admitting handwriting evidence of defendant after a law enforcement agent laid a foundation through his review of other genuine documents signed by the defendant), citing *United States v. Garth*, 540 F.3d 766, 778-79 (8th Cir. 2008) (agent's non-expert testimony that signatures on various tax returns appeared to be similar was admissible, as the jury could consider and compare the tax returns during deliberations).   A former co-worker who was familiar with another employee's handwriting had the requisite familiarity with a signature to identify the employee's signature in various documents at trial.   *United States v. Brink*, 648 F.2d 1140 (8th Cir. 1981) (the testimony of a non-expert's opinion on handwriting is admissible, and the jury is ultimately free to decide the authenticity of the handwriting).

At trial, there will be sufficient and common sense foundational evidence that the doctors are familiar with their own signatures, and therefore can compare the various "dr" signatures found in YAIC's patient records, meaning the rules' requirements will be satisfied.   *Miiler v. Prospect Mortg., LLC*, 2014 WL 667363, 2014 U.S. Dist. LEXIS 21994 (D. Colo. 2014) (holding that an individual can authenticate his own handwriting and is assumed to be able to recognize his or her own handwriting).   Therefore, patient records that YAIC's chiropractors identify as containing their true signatures and handwriting can be used for comparison by the jury to determine whether the signatures or handwriting on other patient records are genuine, without the need for expert testimony regarding the handwriting.

## V.    <u>Admissibility of Bank Records</u>

In this case, the government will also seek to admit into evidence bank records from a local bank, including checks, monthly statements, and deposits for accounts belonging to the defendant. The bank's records will prove that Muhammed paid chiropractors set amounts to work a fixed

medical schedule of two days a week at the clinic, with no extra payments shown in the pay roll checks for additional work, such as "extra" work days or Sundays.

More broadly, the bank records will further show that Mr. Muhammed had a financial motive to make the false statements referenced in the Indictment because he personally received money from assorted healthcare programs for the clinic's patients, and also received substantially more money from insurance companies than any of the chiropractors he employed at YAIC at various times.

A bank's business records are admissible and self-authenticating under Fed. R. Evid. 803(6) and 902(11) when accompanied by a certification of a custodian of records demonstrating that the record was made by, or from information transmitted by, someone with knowledge of the matter and the making of the record was a regularly conducted business activity.  *Ali*, 616 F.3d at 754 (HSBC bank check records were admissible with a records custodian declaration from a bank employee, and their admission did not raise Confrontation Clause issues because they were kept by the bank in the ordinary course of business); *United States v. Thompson*, 686 F.3d 575, 581-82 (8th Cir. 2012) (holding state agency's unemployment records that were kept by the agency in the course of its regular business activities were admissible when accompanied by a records custodian's affidavit); *see also United States v. Mashek*, 606 F.3d 922, 930 (8th Cir.2010) (holding that "business records under Rule 803(6) are non-testimonial statements to which the Confrontation Clause does not apply" when admitting drug purchase records).

## VI.  Exclusion of Witnesses

The Government expects to move for the exclusion of witnesses from the courtroom under Fed. R. Evid. 615, with the exception of the Government's case agents, F.B.I. Special Agents Michael Badolato.

## VII.   Victim Notification

The Government has notified the automobile insurance companies who provided payment for claims of the five patients referenced in the Indictment of the trial date, and offered representatives of each insurance company logistical assistance if they want to attend trial.   In the event of a conviction, the United States will seek restitution for each of the affected insurance companies.

## **CONCLUSION**

This brief addresses certain issues that may arise at trial.   Should additional issues arise that have not been addressed, the government requests the opportunity to provide additional briefing.

Respectfully submitted,

RICHARD CALLAHAN
United States Attorney

  /s/ Andrew Lay #39937MO
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri   63102
(314) 539-2200

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2014, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Michael Bert, Counsel for Defendant

/s/ Andrew Lay
Assistant United States Attorney